## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

### WELL LUCK COMPANY, INC.

*Plaintiff-Appellant*,

v.

### UNITED STATES,

*Defendant-Appellee*.

Appeal from the United States Court of International Trade
in Court No. 13-00064, Judge Claire R. Kelly

**Reply Brief of Plaintiff-Appellant, Well Luck Company, Inc.**

Luis F. Arandia, Jr.
Robert T. Givens

GIVENS & JOHNSTON, PLLC
950 Echo Lane, Suite 360
Houston, TX 77024
Telephone: (713) 932-1540
Email: larandia@givensjohnston.com

*Counsel for Plaintiff-Appellant,
Well Luck Company, Inc.*

Dated: September 13, 2017

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Well Luck Company, Inc.     **v.**     United States

Case No.    17-1816

## CERTIFICATE OF INTEREST

Counsel for the:

☐ (petitioner) ☒ (appellant) ☐ (respondent) ☐ (appellee) ☐ (amicus) ☐ (name of party)

Well Luck Company, Inc.

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10 % or more of stock in the party |
|---|---|---|
| Well Luck Company, Inc. | Not applicable | None |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

Luis F. Arandia, Jr., Givens & Johnston, PLLC; Robert T. Givens, Givens & Johnston, PLLC

Sep 13, 2017

Date

/s/ Luis F. Arandia, Jr.

Signature of counsel

Please Note: All questions must be answered

Luis F. Arandia, Jr.

Printed name of counsel

cc:

Reset Fields

# **Table of Contents**

Table of Authorities ................................................................................ ii

Introduction ..............................................................................................1

Argument...................................................................................................2

  I.   The Government ignores the trial court's express finding that the common and commercial meaning of "sunflower seeds" includes snacking seeds. .............2

  II.    Unless Congress indicates to the contrary, HTSUS heading 1206 covers all sunflower seeds, including snacking seeds...........................................................7

    A.   Snacking sunflower seeds do not possess features substantially in excess of those within the common and commercial meaning of "sunflower seeds" because the common meaning wholly encompasses snacking seeds..................7

    B.   The *Nootka Packing* Court distinguished the Government's cited cases in its *eo nomine* ruling. ......................................................................11

    C.   The Government dismisses its own "Guidance for Interpretation of the Harmonized System" concerning 1978 Customs Cooperation Council Nomenclature documents. ...................................................................15

  III.   Even if the General EN for HTSUS Chapter 12 are held to be relevant and persuasive in this case, Well Luck's snacking sunflower seeds are of a kind used for "other purposes."..............................................................................18

Conclusion and Relief Sought ................................................................19

Certificate of Service ..............................................................................21

Certificate of Compliance with Word Count Limitation ........................22

i

# Table of Authorities

**Cases**

*Airflow Tech., Inc. v. United States,*
  524 F.3d 1287 (Fed. Cir.2008) ............................................................4

*Arko Foods Int'l, Inc. v. United States,*
  654 F.3d 1361 (Fed.Cir.2011) ...................................................... 4, 9, 10

*Bausch & Lomb, Inc. v. United States*
  148 F.3d 1363 (Fed. Cir. 1998) ..........................................................10

*Brennan v. United States,*
  136 Fed. 743 (1st Cir. 1905)..............................................................14

*CamelBak Prods., LLC v. United States,*
  649 F.3d 1361 (Fed. Cir. 2011) ..................................................... 7, 8, 9

*Carl Zeiss, Inc. v. United States,*
  195 F.3d 1375 (Fed. Cir. 1999) .........................................................4, 5

*Casio, Inc. v. United States,*
  73 F.3d 1095 (Fed. Cir. 1996) ..............................................................7

*Kahrs Int'l, Inc. v. United States,*
  713 F.3d 640 (Fed. Cir. 2013) ..............................................................4

*La Crosse Tech., Ltd. v. United States,*
  723 F.3d 1353 (Fed. Cir. 2013) ............................................................9

*Mawer Co. v. United States,*
  7 U.S. Ct. Cust. App. 493, T.D. 37108 (1917)....................................12

*Neuman & Schwiers Co. et al. v. United States,*
  4 U.S. Ct. Cust. App. 64, T.D. 33310 (1910)......................................12

*Nootka Packing Co. v. United States,*
  22 C.C.P.A. 464 (1935) ....................................................... 12, 13, 14

*Rice Millers' Assoc., etc. v. United States,*
  15 U.S. Ct. Cust 355, 359, T.D. 42560 (1928)....................................14

*Swan v. Arthur,*
  103 U.S. 597, 26 L.Ed. 525 (1881) ......................................................3

*Tyco Fire Products, L.P. v. United States,*
  841 F.3d 1353 (Fed. Cir. 2016) ..................................................... 16, 17

*Tyng v. Grinnell,*
  92 U.S. 467, 470 23 L.Ed. 733 (1876) ................................................14

*United Sates v. Pacific Trading Co.,*
  14 U.S. Cust. App. 131, T.D. 41649 (1926)........................................13

*United States v. La Manna et al.,*
  14 U.S. Cust. App. 123, T.D. 41647 (1926)................................... 13, 14

*United States v. Sheldon & Co.,*
    14 U.S. Ct. Cust. App. 228, T.D. 41708 (1926) ..................................................12

**<u>Other Authorities</u>**
General Explanatory Note to Chapter 12, HTSUS ................................................18
*Plant Guide: Annual Sunflower,* U.S. Dep't of Agriculture ...................................19
*Sunflower Seed/Kernel*, Nat'l Sunflower Ass'n .....................................................19

## Introduction

In its opening brief, Plaintiff-Appellant Well Luck Company, Inc. ("Well Luck") established that snacking sunflower seeds are "sunflower seeds" under Heading 1206 of the Harmonized Tariff Schedule of the United States ("HTSUS") because of two fundamental principles of tariff interpretation. First, lexicographic and industry sources demonstrate that snacking sunflower seeds fall under the common and commercial meaning of "sunflower seeds." Second, "sunflower seeds" includes processed sunflower seeds because the *eo nomine* tariff provision is unambiguous and unlimited. Under standard tariff classification analysis, nothing more is required to properly classify Well Luck's sunflower seeds as "sunflower seeds" under Heading 1206, HTSUS.

The trial court deviated from these well-settled principles and erroneously narrowed the correct meaning of "sunflower seeds." Relying on the Explanatory Notes and tariff structure, the trial court created and inserted a limitation to "sunflower seeds" that does not exist in the legal language of the HTSUS. Based on these reversible errors, we requested that this Court reject the trial court's reasoning, and instead classify Well Luck's snacking sunflower seeds as "sunflower seeds."

Defendant-Appellee's, the United States ("Government"), response is that the General Explanatory Notes to HTSUS Chapter 12 ("General EN") and tariff

structure trump the General Rules of Interpretation, the common and commercial meaning and an unlimited *eo nomine* tariff provision. For the reasons set forth below, the Government's arguments must fail.

The Government asserts that the common and commercial meaning of "sunflower seeds" does not include snacking seeds. Red Br. 15-17. The Government ignores the trial court's express finding that the common and commercial meaning of "sunflower seeds" includes snacking seeds. Appx008-010. The Government further contends that the unique features of Well Luck's seeds remove the goods from the *eo nomine* provision. Red Br. 23-24. But, the Government misinterprets that the "substantially in excess" *eo nomine* doctrine hinges on the common and commercial meaning of the "sunflower seeds" which includes snacking seeds. Finally, the Government defends the trial court's reliance on the General EN to argue that Well Luck's sunflower seeds are not "sunflower seeds." *Id*. at 17-22. Even if the General EN are held to be relevant and persuasive, the General EN do not exclude snacking seeds from HTSUS Chapter 12.

## Argument

## I. The Government ignores the trial court's express finding that the common and commercial meaning of "sunflower seeds" includes snacking seeds.

The correct meaning of "sunflower seeds" is its common and commercial meaning which encompasses Well Luck's snacking sunflower seeds.[1] After examining Well Luck's lexicographic and industry sources, the trial court found that the common and commercial meaning of "sunflower seeds" includes snacking seeds. Appx008-010. In its brief, the Government ignores the trial court's critical and express finding that the common and commercial meaning of sunflower seeds includes snacking seeds. Instead, the Government, without reference to the trial court's finding, contradicts it and simply states, without any support whatsoever, that the common and commercial meaning does not include snacking seeds – just the opposite of the court's finding. Furthermore, the Government proffers zero authorities in support of any different commercial meaning that is definite, uniform, and general throughout the trade.

A bedrock principle in tariff classification interpretation is that the Courts look to the common and commercial meaning of the terms involved. "[T]ariff provisions are generally to be construed according to the commercial understanding of the terms employed," *Swan v. Arthur*, 103 U.S. 597, 598, 26 L.Ed. 525 (1881), so that "[a]bsent contrary legislative intent, HTSUS terms are to

---

[1] Throughout the brief, Well Luck uses the term "snacking seeds" as a short-hand for confectionary-type sunflower seeds that have been roasted, salted, and or flavored. In its initial brief, Well Luck described the differences between confectionary-type grown for human consumption and oilseed-type grown for oil extraction, regardless of the type of processing. *See* Blue Br. 25-28.

be construed according to their common and commercial meanings, which are presumed to be the same." *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999). Moreover, this Court has held that "[w]here the HTSUS does not expressly define a term, the correct meaning of the term is its common commercial meaning." *Arko Foods Int'l, Inc. v. United States*, 654 F.3d 1361, 1364 (Fed. Cir. 2011) (citing *Airflow Tech., Inc. v. United States*, 524 F.3d 1287, 1291 (Fed. Cir. 2008). "To discern the common meaning of a tariff term, [this Court] may consult dictionaries, scientific authorities, and other reliable information sources." *Kahrs Int'l, Inc. v. United States*, 713 F.3d 640, 644 (Fed. Cir. 2013).

The Government claims that Well Luck's encyclopedias, dictionary references, and sunflower industry usage failed to establish that the common and commercial meaning of "sunflower seeds" includes snacking seeds. Red Br. 16-17. The trial court, however, negates the Government's position because it did find that the common and commercial meaning of "sunflower seeds" includes snacking seeds.

The trial court examined Well Luck's lexicographic authorities which "indicate that 'sunflower seeds' can be, or are usually, dried or roasted to be eaten as a snack." Appx008. Well Luck's published industry sources also "reflect that 'sunflower seeds" may be eaten as a snack either raw, roasted, or seasoned." Appx009-010. Furthermore, Well Luck's lexicographic sources "indicate the

commercial meaning of 'sunflower seeds' may include seeds of the plant *Helianthus annuus* that are relatively unprocessed and for general use as well as those that are further processed by roasting, salting, and/or flavoring suitable to be eaten as a snack." Appx010. Thus, Well Luck's lexicographic and industry sources informed the trial court that the common and commercial meaning of "sunflower seeds" includes snacking seeds.

The Government misses the trial court's understanding for the common and commercial meaning. Instead, the Government argues that the "definition" of sunflower seed is "a seed of the common sunflower plant, *Helianthus annuus*." Red Br. 16. One who argues that a tariff term should not be given its common or dictionary meaning must prove that it has a different commercial meaning that is definite, uniform, and general throughout the trade. *Carl Zeiss, Inc.*, 195 F.3d 1379. The Government has yet to offer any dictionary or industry sources to **re-define** the common and commercial meaning of "sunflower seeds" as simply seeds of the sunflower plant.

The Government's brief further confuses the point by arguing "[t]hat a good of an *eo nomine* provision may be used in certain ways or subjected to a variety of processes, does not supplant or expand the common and commercial meaning of that good." Red Br. 16. Again, the Government ignores the common and commercial meaning of "sunflower seeds." Based on Well Luck's lexicographic

and industry sources, the trial court found that "sunflower seeds" includes "more processed prepared sunflower seeds suitable for specific purposes." Appx012.

The common and commercial meaning of "sunflower seeds" is also why Heading 1206, HTSUS, is unique. The Government contends that if Well Luck's argument is correct, then prepared or preserved soybeans under subheading 2008.99.61, HTSUS, would be made superfluous. Red Br. 32. The Government claims that HTSUS is rife with examples of goods that are specifically provided for in both their unprocessed and processed states. *Id*. Nevertheless, the Government's assertion in this regard actually supports Well Luck's argument.

Because the common and commercial meaning of "sunflower seeds" includes snacking sunflower seeds **and** there is no alternate *eo nomine* provision for processed sunflower seeds, Heading 1206, HTSUS, is the appropriate tariff classification for snacking seeds. Congress' exclusion of "roasted or otherwise cooked" peanuts from Heading 1202, HTSUS, and its election to provide an *eo nomine* provision for processed soybeans (and other goods) is evidence of legislative intent to include snacking sunflower seeds in Heading 1206, HTSUS.

Consequently, absent statutory language to the contrary, the correct meaning of the unlimited *eo nomine* term "sunflower seeds" is its common and commercial meaning which includes Well Luck's snacking seeds.

**II. Unless Congress indicates to the contrary, Heading 1206, HTSUS, covers all sunflower seeds, including snacking seeds.**

   ***A. Snacking sunflower seeds do not possess features substantially in excess of those within the common and commercial meaning of "sunflower seeds" because the common meaning wholly encompasses snacking seeds.***

   Heading 1206, HTSUS, is an unlimited *eo nomine* provision that includes all forms of "sunflower seeds" named in the tariff heading. The Government argues that the unique features of Well Luck's seeds remove the goods from the *eo nomine* provision. Red Br. 23-24. But, the "substantially in excess" *eo nomine* doctrine turns on the **common and commercial meaning** of the "sunflower seeds," which includes snacking seeds.

   Absent limitation or contrary legislative intent, an *eo nomine* provision includes all forms of the named article, even improved forms. *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1365 (Fed. Cir. 2011). An article is excluded from an *eo nomine* provision if it "is in character or function something other than as described by a specific statutory provision—either more limited or more diversified—and the difference is significant." *Id.* (quoting *Casio, Inc. v. United States*, 73 F.3d 1095, 1097 (Fed. Cir. 1996)). The criterion is whether the item

possesses features substantially in excess of those within the common meaning of the term. *Id*.

The trial court found the common and commercial meaning of "sunflower seeds" includes snacking seeds. Appx008-010. No individual consumer in the United States seeking to purchase snacking seeds would use anything other than the words "sunflower seeds" to communicate an intent to purchase snacking seeds. Nor would any vendor ask the consumer whether they mean sunflower seeds for oil extraction or sowing. This is the essence of common and commercial meaning, at least at the retail level.

Well Luck's sunflower seeds do not possess unique features substantially in excess of those within the common meaning of "sunflower seeds" because the common meaning wholly encompasses the merchandise. Under the common, commercial, and industrial understanding of "sunflower seeds," roasting and salting does not alter the identity of sunflower seeds.

Roasting and salting does not substantially alter the appearance or essence of sunflower seeds, because the average consumer would identify the snacking seeds precisely as "sunflower seeds." Any baseball fan may order "sunflower seeds" with perfect confidence that the seeds will be roasted, salted and/or seasoned. *See GEICO Radio Ad*, Martin Agency, Appx246.

Almost every instance where this Court has excluded a product from an *eo nomine* provision involved products that acquired physical, additional components that gave the objects a new function. In these cases, the additions to the product warranted classification based only on component parts or rendered the products *prima facie* classifiable under more than one heading. *See CamelBak*, 649 F.3d at 1365 (holding that backpacks accompanied by an additional hydration pack warranted classification based on that component part which did not fall within the common meaning of "backpack" because of its hydration function); *La Crosse Tech., Ltd. v. United States*, 723 F.3d 1353, 1359–60 (Fed. Cir. 2013) (holding that additional time-related functions of electronic devices that measured and displayed atmospheric and weather conditions caused the products to be classifiable under more than one heading). Well Luck's snacking sunflower seeds do not possess any new features or functions after roasting, salting, or spicing, which render them something distinct from "sunflower seeds," as that term is understood commonly and commercially.

The Government argues that the "ingredients and processes necessary to manufacture [Well Luck's sunflower seeds] create a specific use product that is substantially different from the natural general use seeds classifiable in HTSUS Chapter 12." Red. Br. 24. The Government analogizes mellorine, in *Arko Foods Int'l, Inc. v. United States*, 654 F.3d 1361 (Fed Cir. 2011), and electric

9

toothbrushes, in *Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998), to argue that Well Luck's sunflower seeds possess unique features in excess of products classifiable in HTSUS Chapter 12.  Red Br. 23-24.

These cases are all immaterial to this Court's "substantially in excess" analysis.  In *Arko Foods*, this Court applied GRI 3(b)'s "essential character" test to find that mellorine is not an article of milk.  654 F.3d 1361, 1365-66.  Here, the Government does not apply GRI 3(b)'s "essential character" test nor does it even argue that GRI 3 is applicable.  Moreover, in *Bausch & Lomb*, this Court found that a parenthetical phrase in the importer's preferred provision, HTSUS heading 9603, covered "only brushes that were a part of a machine, appliance or vehicle that are imported separately," and not electric toothbrushes. 148 F.3d 1363, 1366-1369.  However, by way of contrast, the Government does not argue that the **plain language** of HTSUS heading 1206 excludes snacking sunflower seeds.

Unlike the hydration pack in *CamelBak* and the time functions in *La Crosse*, all of which added additional parts or functions that an already existing product could not perform, roasting, salting, and flavoring sunflower seeds does not create any additional functions.  Roasting and salting sunflower seeds is not necessary for human consumption.  Although the roasting and salting provides flavor variety, it is not uncommon for sunflower seeds in the shell to be eaten raw.  Thus, the roasting and salting does not substantially alter the sunflower seed's features,

function, or its intended use, because it is still considered edible and consumed by humans in either condition.

Furthermore, adding salt or spices, which are the only physical "additions" to Well Luck's sunflower seeds, does not warrant classification in a different heading. Adding salt and spices is not akin to adding a separate hydration pack to a backpack as in *CamelBak*. Salt and spices are such an incidental part of the sunflower seed that they do not alter its identity as a sunflower seed. Therefore, Well Luck's sunflower seeds do not possess any additional features or functions that endow them with a unique identity substantial enough to justify their removal from the scope of HTSUS heading 1206 in which they *prima facie* fall.

## B. The Nootka Packing *Court distinguished the Government's cited cases in its* eo nomine *ruling.*

In its principal brief, Well Luck discussed three decisions of this Court's predecessor courts to argue that unlimited *eo nomine* tariff provisions (like Heading 1206, HTSUS) include all processed and unprocessed forms of the article. Blue Br. 15-17. The Government contends that these cases are inapposite and further claims that Well Luck neglected older controlling decisions from the U.S. Court of Customs Appeals ("CCA"). Red Br. 24-28. To the contrary, Well Luck did not disregard the Government's cited cases because the U.S. Court of Customs and Patent Appeals ("CCPA") similarly distinguished them when it favored an *eo*

*nomine* provision in *Nootka Packing Co. v. United States*. 22 C.C.P.A. 464, 468 (1935).

In *Nootka Packing*, the CCPA held that canned, cooked, minced clam meat in brine is properly classifiable as "clams . . . in air tight containers" because "mere mincing of claims, or cleaning them, or cooking them **does not remove them from the designation of clams**." *Id.* at 467. (emphasis added). Citing CCA precedent, the CCPA held that "an eo nomine statutory designation of an article, without limitations or a shown contrary legislative intent, judicial decision, or administrative practice to the contrary, and without proof of commercial designation[2], will **include all forms of said article**." *Id.* at 470 (emphasis added) (citing *Neuman & Schwiers Co. et al. v. United States*, 4 U.S. Ct. Cust. App. 64, T.D. 33310 (1910) (holding that cooked and canned hams were classifiable as "hams" and not "prepared or preserved meats"); *and Mawer Co. v. United States*, 7 U.S. Ct. Cust. App. 493, T.D. 37108 (1917) (holding that olives, pitted, stuffed with pimentos, sterilized and soaked and canned, were classifiable as "olives," and not "edible fruits . . . prepared or preserved")).

The Government claims that another line of cases should control (exemplified by the "pistache" (pistachio) nuts case, *United States v. Sheldon & Co.,* 14 U.S. Ct. Cust. App. 228, T.D. 41708 (1926)), rather than *Nootka Packing*.

_____

[2] Implicitly, some different commercial designation.

Red Br. 27-28.  The CCPA considered and distinguished these cases.  First, the

*Nootka Packing* Court distinguished the "pistache" nuts case because Congress

indicated its contrary intention to exclude prepared "pistache" nuts from the *eo*

*nomine* provision.  *Nootka Packing Co.*, 22 C.C.P.A. 468.  Additionally, "that case

did not rest upon the competition between pistache nuts and edible nuts, prepared

or preserved, alone."  *Id*.

Here, like the clams provision in *Nootka Packing*, Congress drafted an

unlimited *eo nomine* provision and did not indicate a contrary intention to limit

"sunflower seeds" to their raw state.  Moreover, like the *Nootka Packing* case, the

competing headings are between an *eo nomine* provision ("*sunflower seeds*") and a

basket provision ("*fruit, nuts and other edible parts of plants, otherwise prepared*

*or preserved, . . . not elsewhere specified or included*").

The *Nootka Packing* Court also distinguished the pickled onion and scallion

cases, *United States v. La Manna et al.,* 14 U.S. Cust. App. 123, T.D. 41647 (1926)

and *United Sates v. Pacific Trading Co*., 14 U.S. Cust. App. 131, T.D. 41649

(1926), because of legislative history and commercial usage that compelled the

CCA to conclude that only onions in their natural state were intended to be

included in the *eo nomine* provision for onions.  *Nootka Packing Co.*, 22 C.C.P.A.

468.  Specifically, the CCA found that the basis of duty on onions changed from

bushels to pounds to conform to a **different commercial usage** which excluded

pickled onions from the *eo nomine* provision. *United States v. La Manna et al.,* 14 U.S. Cust. App. 127.

The CCPA again distinguished the brined limes case, *Brennan v. United States*, 136 Fed. 743 (1st Cir. 1905), because of **commercial usage**. "[T]ere was a commercial designation distinguishing limes in brine from fresh limes, and a long established administrative practice distinguishing the same." *Nootka Packing Co.*, 22 C.C.P.A. 468. One critical fact distinguishes this case from the onion case and the brined limes case – in the latter two cases the commercial usage differed from the common meaning. In this case, however, they are the same.

"Tariff laws are . . . drafted in the language of commerce." *Rice Millers' Assoc., etc. v. United States*, 15 U.S. Ct. Cust 355, 359, T.D. 42560 (1928) (citing *Tyng v. Grinnell*, 92 U.S. 467, 470 23 L.Ed. 733 (1876)). The Government does not dispute the trial court's finding that indicates the "commercial meaning of 'sunflower seeds'" includes snacking sunflower seeds. Appx010. Moreover, there is no clear legislative intent, judicial decision, or administrative practice that **excludes** snacking sunflower seeds from Heading 1206, HTSUS.

Consequently, absent statutory language to the contrary and in line with prior precedent, the unlimited *eo nomine* term "sunflower seeds" includes Well Luck's snacking seeds.

***C. The Government dismisses its own "Guidance for Interpretation of the
Harmonized System" concerning 1978 Customs Cooperation Council
Nomenclature documents.***

The Government submits documents that the Secretariat of the World
Customs Organization's Harmonized System Committee ("HSC") and "its
delegates have long considered roasted groundnuts and oil seeds to be classifiable
in HTSUS heading 2008 (then heading 2009), and not in Chapter 12." Red. Br.
30-31. To support this proposition, the Government cites to three 1978 documents
from the Customs Committee Council Nomenclature ("CCCN"). *Id.* at 31. These
include Swiss delegation comments to the HSC (Appx590-592) and Nomenclature
Committee working documents (Appx593-601). *Id.* However, the Government's
argument dismisses its own guidance discounting these documents as well as this
Court's recent decision on appropriate interpretative methodology.

For instance, eight months after the HTSUS was implemented, the U.S.
Customs Service published a "Guidance for Interpretation of the Harmonized
System," ("Guidance") which set forth its official position on the weight to be
afforded to CCCN documentation. 54 Fed. Reg. 35,127 (Aug. 23, 1989). With
respect to the Nomenclature Committee reports, the Guidance explained that
"[t]hey carry virtually no weight" and that "[d]ecisions of the Nomenclature

Committee cannot imply an intent on the HSC." *Id*. at 35,129. The Guidance

further explained why Customs gives "virtually no weight" to these documents:

> When the HS was drafted it was decided to prepare an entirely new
> convention to implement it. It was the intention of the HSC to start
> anew; to have a new convention unencumbered by the many years of
> action by the Nomenclature Committee. Although the HS is primarily
> based on the CCCN, it is a new and different nomenclature with a
> convention that provides for substantial difference in its voting
> membership. Customs finds that there is no reason to believe that
> questions decided by the Nomenclature Committee would produce the
> same result in the HSC. *Id*.

Regarding "working documents" consisting of commentary by delegations,

the Guidance again stated they "carry virtually no weight in interpreting the

system." *Id*. Additionally, "[b]ecause it is preliminary material, none of it reflects

the intent of the HSC." *Id*.

Here, the Government does not even acknowledge its own 1989 Guidance

and relies on 1978 "working documents" consisting of commentary by delegations

to imply the "intent" of the exclusionary language in HTSUS heading 1202 and

HTSUS Chapter 12. The Government should heed its own Guidance which

requires that it dismiss the "working documents" entirely and look instead to

common and commercial meaning of "sunflower seeds." Indeed, this Court

recently endorsed this interpretative approach in *Tyco Fire Products, L.P. v. United

States*, 841 F.3d 1353, 1359-60 (Fed. Cir. 2016).

In *Tyco Fire Products, L.P.*, the Government urged this Court to examine 1970 CCCN Explanatory Notes for the meaning of "high proportion" in the current Explanatory Notes to Chapter 84. *Id*. at 1359. This Court noted that the Government "provide[d] no explanation as to why the [CCCN] Explanatory Notes –and any amendments thereto – should be treated as a form of legislative history to the current HTSUS." *Id*. Notably, the Court did not decide whether 1970 CCCN Explanatory Notes were relevant to construing tariff terms because it "conclude[d] that a different –and **governing**–interpretative methodology ultimately leads to the same result." *Id*. (emphasis added). The Court then defined "high proportion" from lexicographic authorities. *Id*. at 1359-60.

In sum, this Court should follow the **governing** interpretative approach which examines the common and commercial meaning of words as the correct meaning to determine classification. This Court will find that under a GRI 1 analysis, the scope of HTSUS heading 1206 (i.e., the common and commercial meaning) expressly includes sunflower seeds without limitation. Moreover, absent limiting language or indicia of contrary legislative intent, HTSUS heading 1206, an *eo nomine* provision, covers all forms of the article including snacking sunflower seeds.

**III.  Even if the General EN for HTSUS Chapter 12 are held to be relevant
and persuasive in this case, Well Luck's snacking sunflower seeds are of a
kind used for "other purposes."**

Even if this Court finds the General EN for HTSUS Chapter 12 relevant and
persuasive, the Explanatory Notes do not exclude Well Luck's merchandise from
Chapter 12 because snacking seeds are of a kind used "for other purposes," namely
for human consumption.  The Government fails to recognize that the General EN
provides for "other purposes" as a permitted use.

The General EN provides for three suggested uses for sunflower seeds: (1)
extraction of edible industrial oils and fats; (2) for sowing; or (3) for other
purposes.  *See* General EN Chapter 12.  The Government improperly ignores and
excludes the third suggested use (*i.e.* "for other purposes"), focusing its
understanding of "sunflower seeds" to "those that are used for the extraction of
edible or industrial oils and fats, but they need be used for that purpose." Red Br.
18.  The Government disregards and does not discuss the third suggested use for
sunflower seeds – "other purposes."  The General EN do not, however, define
"other purposes."

Well Luck contends that "other purposes" includes a purpose involving
human consumption as a snack.  The trial court found that the common and
commercial meaning of "sunflower seeds" includes snacking seeds as well as seeds

for oil extraction and sowing. Appx010. The National Sunflower Association further promotes the human consumption of "sunflower seeds" as a snack. *Sunflower Seed/Kernel*, Nat'l Sunflower Ass'n, Appx237. Similarly, according to the U.S Department of Agriculture's *Plant Guide*, "[s]unflower seeds were and still are eaten raw, roasted, cooked, dried, and ground, and used as a source of oil." *Plant Guide: Annual Sunflower*, U.S. Department of Agriculture, Appx247.

Consequently, the primary and most convincing "other purpose" for Well Luck's snacking sunflower seeds is for human consumption as a snack.

## Conclusion and Relief Sought

Well Luck's snacking sunflower seeds are properly classifiable as "sunflower seeds" under Heading 1206, HTSUS for two reasons. First, the trial court agreed with Well Luck that the common and commercial meaning of "sunflower seeds" includes snacking seeds. Second, Heading 1206, HTSUS, is an unlimited and unambiguous *eo nomine* tariff provision that includes all forms of "sunflower seeds" including snacking seeds. Under conventional tariff classification analysis, nothing more is required to compel a finding that Well Luck's sunflower seeds are "sunflower seeds."

The trial court deviated from traditional interpretive methodology to judicially add a limitation into the HTSUS that does not exist. Further, the trial court's reliance on the Explanatory Notes and HTSUS structure to narrow the

scope of "sunflower seeds" is not supported by law. The trial court improperly determined that Well Luck's merchandise is classifiable under 2008.19.90, HTSUS. The trial court's narrow interpretation is legally unsustainable.

Therefore, Well Luck respectfully requests that this Court find that roasted, salted, and/or flavored sunflower seeds for snacking are classifiable as "sunflower seeds" under subheading 1206.00.00, HTSUS. Accordingly, we ask the Court to reverse the decision of the U.S. Court of International Trade.

Respectfully submitted,

Luis F. Arandia, Jr.
Robert T. Givens

GIVENS & JOHNSTON, PLLC
950 Echo Lane, Suite 360
Houston, TX 77024
Telephone: (713) 932-1540

*Counsel for Plaintiff-Appellant,*
*Well Luck Company, Inc.*

Dated: September 13, 2017

## Certificate of Service

I, Luis F. Arandia, Jr., hereby certify that on September 13, 2017, I caused service

of a copy of the Reply Brief via the Court's ECF system to the following party:

Alexander Vanderweide
International Trade Field Office
Commercial Litigation Branch
United States Department of Justice
26 Federal Plaza, Room 346
New York, NY 10278

/s/ LUIS F. ARANDIA, JR.
Luis F. Arandia, Jr.
GIVENS & JOHNSTON, PLLC
950 Echo Lane, Suite 360
Houston, TX 77024
Tel: (713) 932-1540
Email: larandia@givensjohnston.com

*Counsel for Plaintiff-Appellant,*
*Well Luck Company, Inc.*

## Certificate of Compliance with Word Count Limitation

Appellant Well Luck Company, Inc. and its undersigned counsel certify that this principal brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and contains 4,236 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), and pursuant to those requirements, this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point font.

Dated: September 13, 2017          Respectfully submitted,

/s/ LUIS F. ARANDIA, JR.
Luis F. Arandia, Jr.

/s/ ROBERT T. GIVENS
Robert T. Givens

GIVENS & JOHNSTON, PLLC
950 Echo Lane, Suite 360
Houston, TX 77024
Tel: (713) 932-1540

*Counsel for Plaintiff-Appellant,*
*Well Luck Company, Inc.*